UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEBRA L. FISHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-1741-DFH-JMS |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Debra Fisher brings this action seeking review of the final decision of the Commissioner of the Social Security Administration denying her application for supplemental security income.   An Administrative Law Judge ("ALJ") determined that Mrs. Fisher was not disabled because she was capable of performing some types of simple, repetitive, light work.  As explained in detail below, the court affirms the ALJ's denial of the application for supplemental security income.

---

[1]Michael J. Astrue took office as Commissioner of the Social Security Administration while Ms. Fisher's case was pending before the court. Commissioner Astrue is substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

*Background*

Mrs. Fisher was born in 1964.  She completed ninth grade in special education classes.  R. 211.  Mrs. Fisher married and eventually became the mother of three children.  She has no past work experience outside of her home. R. 185.  She received supplemental security income from 1993 to 1999, but those benefits were terminated when she was incarcerated.  R. 214.  Mrs. Fisher filed a disability report seeking supplemental security income on May 14, 2001, which was denied initially on October 5, 2001 and again on reconsideration on January 25, 2002.  R. 69-72, 48-54.  She filed a new application on June 18, 2003, alleging disability since August 1, 1993.  R. 64-66.

The record shows that Mrs. Fisher has suffered from a variety of physical ailments.  In a motorcycle accident in 1995, she sustained a serious injury to her left foot.  R. 547.  An examination by Dr. Henderson in July 2001 revealed that her ability to walk was no longer impaired.  R. 563.  Mrs. Fisher also has a history of lower back pain, R. 494, 561-64, shoulder problems, R. 252-56, 619, kidney stones, R. 332, and migraine headaches, R. 322, and she has tested positive for Hepatitis C, R. 372.

Mrs. Fisher has complained of both emphysema and asthma.  In September 1993, Dr. Olvey diagnosed Mrs. Fisher with possible early pulmonary emphysema based on her chest expanding only 1.5 inches when breathing deeply.  R. 549-50. After an examination in October 1999, a nurse practitioner from the prison stated,

and a doctor agreed, that she "doubt[ed] emphysema" and recommended discontinuing Mrs. Fisher's use of an albuterol inhaler. R. 411. Another medical professional from the prison noted that Mrs. Fisher had mild intermittent chronic obstructive pulmonary disease. R. 410. With the exception of Dr. Olvey's, the reports of every medical professional that Mrs. Fisher has submitted stated that Mrs. Fisher's lungs were clear upon examination. See, *e.g.*, R. 240, 254, 343, 563. Mrs. Fisher has stated that she has smoked two packs of cigarettes per day for over fifteen years. R. 409.

In addition to her physical ailments, Mrs. Fisher has a variety of mental challenges. She has a long history of alcohol abuse. She began using alcohol at age 17 and regularly drank multiple drinks in a single day. R. 277. She reported using marijuana on a daily basis as a teenager. R. 278. She was convicted of driving under the influence three times and as a result is unable to obtain a driver's license. R. 275, 657. Mrs. Fisher has generally stopped drinking alcohol since her release from prison in 2003. R. 243. Mrs. Fisher has also been diagnosed with borderline intellectual functioning. R. 524.

Mrs. Fisher has consistently complained of sadness, difficulty sleeping, and an inability to focus. See, *e.g.*, R. 592, 654. She received outpatient treatment at Gallahue Mental Health Center for depression and anxiety beginning in April 1999. R. 566-96. She also received outpatient treatment at the Cummins Mental Health Center from February 2004 through at least July 2005. See R. 656, 686.

Mrs. Fisher has reported hearing voices and seeing demons since the age of four. R. 657. She has had several exorcisms in an attempt to rid her body and home of demons but still believes evil spirits are inside her. *Id.*

On April 13, 2005, Mrs. Fisher reported to the emergency room staff at Methodist Hospital that she "went off" earlier that day and had told her family she was going to get a gun and shoot herself. R. 628. She denied suicidal ideations after arriving at the hospital, explaining she had made those threats only out of anger and that she wanted to stay alive to avoid going to hell and because of her children. *Id.*

Mrs. Fisher's health care providers have noted various impressions of her mental state, including: dysthymia disorder (May 18, 1999), R. 585; major depression, recurrent, moderate, and panic disorder with agoraphobia (August 13, 2001), R. 558; depression (August 23, 2001), R. 259; major depression and panic disorder with agoraphobia (October 4, 2001), R. 535; no mental illness aside from alcohol dependence (August 12, 2002), R. 466; double depression with history of dysthymia (October 8, 2003), R. 222; double depression with history of dysthymia, to the point of recent exacerbation to major depression (August 14, 2003), R. 246; major depression with psychosis (March 16, 2004), R. 652-53; major depression single (August 30, 2004), R. 649; major depressive disorder, recurrent, severe with psychotic features (January 22, 2004), R. 639; and rule out schizophrenia or bipolar disorder with psychotic features (April 13, 2005), R. 608.

*Testimony at the Hearing*

At the August 4, 2005 hearing, Mrs. Fisher testified that she was unable to work because of the combination of her physical impairments, R. 676, "real bad nerves," and "a problem being around a lot of people," R. 670.  She explained that she was able to perform chores around the house but had to take many breaks due to pain in her leg and back.  R. 673.  Mrs. Fisher stated that demons continued to torment her.  R. 674-75.  She stated that she would not be able to get along with a boss because she did not have patience and feared they would argue.  R. 680.

Mrs. Fisher described crocheting and writing as two activities that she enjoys.  R. 679, 683.  She also helps care for her brother's eighteen dogs.  R. 688. She stated that while she was incarcerated, she worked cleaning up buildings, washing vehicles, shoveling snow, picking up branches and trash, and cleaning restrooms.  R. 690.

Mrs. Fisher's ex-husband, Gary Fisher, also testified at the hearing.  He stated that Mrs. Fisher has difficulty coping with things and is often nervous.  R. 695-96.  He explained that Mrs. Fisher is typically able to supervise her teenage children for only one day at a time because she becomes very nervous.  R. 696.

Vocational Expert Constance Brown testified that a hypothetical person of Mrs. Fisher's age, education, lack of work experience, and ailments who could

perform only simple, repetitive tasks that did not require reading, mathematics, or significant interaction with other people would be able to perform several occupations in Indiana.  R. 698-99.  She specified that such a person would be capable of performing the unskilled, light level occupations of maid/housekeeper (8000 jobs in Indiana), janitor/cleaner (5600 jobs), assembler (2200 jobs), and inspector/tester (500 jobs).  R. 699-700.  The expert testified that no jobs would be available for an individual who had mental problems that made her unable to maintain a full work week in terms of supervision and attendance.  R. 700.

## Procedural History

The ALJ concluded that Mrs. Fisher was not disabled for the purpose of the Social Security Act and issued his decision denying supplemental security income on February 24, 2006.  R. 13-21.  The Appeals Council denied Mrs. Fisher's request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Mrs. Fisher now seeks review by this court of the denial of her application.  The court has jurisdiction in the matter under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## Disability Standards and Judicial Review

To be eligible for supplemental security income, a claimant must establish that she suffers from a disability within the meaning of the Social Security Act.

The claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3).  Mrs. Fisher was disabled only if her impairments were of such severity that she could not engage in any kind of substantial work existing in the national economy, regardless of whether such work was actually available to her.  *Id.*

To determine whether a claimant is disabled, the ALJ must apply the following five-step inquiry:

(1)   Has the claimant engaged in substantial gainful activity?  If so, she is not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that were severe?  If not, she is not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, she is disabled.

(4)   If not, could the claimant do her past relevant work?  If so, she is not disabled.

(5)   If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she is not disabled.  If not, she was disabled.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); see generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Applying the five-step process, The ALJ determined at step one that Mrs. Fisher had never performed substantial gainful activity.  At step two, he determined that Mrs. Fisher had severe impairments based on the combination of anxiety/post traumatic stress disorder/depression/bipolar disorder, estimated borderline intellectual functioning, Hepatitis C, status post dislocated right shoulder, gastro-esophageal reflux diseases, arthritis, and status post injury to left foot.  At step three, the ALJ concluded that the severity of these impairments, singularly or in combination, did not meet or equal any of the impairments listed in Appendix 1, Subpart P, App. 1 ("the Listings").  At step four, the ALJ found that Mrs. Fisher had no past work experience.  At step five, the ALJ concluded that Mrs. Fisher had the residual functional capacity to perform simple and repetitive work that does not require more than superficial interaction with other people, reading, or mathematics.  Based on the testimony of the vocational expert, the ALJ determined that Mrs. Fisher was capable of performing work as a maid/housekeeper, a janitor/cleaner, an assembler, or an inspector, so that she was not disabled.

*Standard of Review*

"The standard of review in disability cases limits . . . the district court to determining whether the final decision of the [Commissioner] is both supported by substantial evidence and based on the proper legal criteria."  *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d

697, 699 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court must "'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision . . . " *Briscoe*, 425 F.3d at 351, quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The court must not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based his decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). This determination by the court requires that the ALJ's decision adequately discuss the relevant issues: "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe*,

425 F.3d at 351, citing *Herron v. Shalala*,19 F.3d 329, 333-34 (7th Cir. 1994). Although the ALJ need not provide a complete written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), a remand may be required if the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), quoting *Dixon*, 270 F.3d at 1176.

*Discussion*

Mrs. Fisher first asserts that the ALJ's opinion does not discuss all of the relevant evidence of her mental illness or her Global Assessment of Functioning (GAF) scores, making it impossible to determine if the ALJ properly considered all of the evidence.  Mrs. Fisher then argues that the ALJ erred in his analysis of steps three and five of the inquiry.  Mrs. Fisher asserts that the ALJ erred at step three by failing to request assistance from a medical expert who was familiar with all of the relevant evidence when determining if she met or equaled the criteria of the Listings.  Mrs. Fisher argues that the ALJ's assessment of her residual functional capacity at step five was flawed because he failed to consider her breathing problems and the impact her mental illness would have on her ability to maintain consistent employment.

I.      *The ALJ's Discussion of the Evidence*

Mrs. Fisher argues that the ALJ failed to discuss many important pieces of evidence with regard to Mrs. Fisher's mental illness.  With reference to Mrs. Fisher's mental health, the ALJ stated that Mrs. Fisher had:   anxiety/ posttraumatic stress disorder, depression, and bipolar disorder.  R. 15.   He discussed in detail mental health evaluations by Dr. Wooden, Dr. Briones-Ramilo and Dr. Robertson.  R. 16-18.   He did not specifically discuss several other impressions of Mrs. Fisher's mental health care providers:  rule out schizophrenia or bipolar disorder with psychotic features (April 2005), R. 608; major depressive disorder, recurrent, severe with psychotic features, post traumatic stress disorder (January 2004), R. 639; double depression with history of dysthymia (October 2003), R. 222; major depression, recurrent, moderate, panic disorder with agoraphobia (August 2001), R. 558; and major depression, panic disorder with agoraphobia (June 2001), R. 526, 528.

In his opinion, the ALJ explicitly stated that Mrs. Fisher did not appear to be psychotic.  R. 19.  While some of the impressions discussed above indicate a concern about psychosis, many of the professionals who worked with Mrs. Fisher opined that her complaints about demons stemmed from her apostolic religious faith, not psychosis.  Mrs. Heymann, Mrs. Fisher's social worker from the Gallahue Mental Health Center, discussed the demons with Mrs. Fisher extensively in April 1999.  Mrs. Heymann stated that Mrs. Fisher "describes these voices & demons in reference to her religion – so that it can be interpreted as

simply 'the work of the devil.' That's why I contacted her – trying to differentiate between Church teaching and mental illness problems." R. 579. An Addictions Therapist from Gallahue also wrote in May 1999: "Past religious upbringing & beliefs appear to be responsible for above beliefs & do not appear to me to be hallucinatory or delusional." R. 307. On November 11, 2004, Mrs. Fisher's psychologist, Dr. Robertson noted: "Pt discussed she is being attended by demons. She can feel them & sometimes see them. Pt does not appear psychotic. This could be part of her apostolic faith." R. 648. The ALJ's implicit rejection of the diagnoses that relate to psychosis is therefore supported by substantial evidence.

The purpose of collecting medical opinions with diagnoses and impressions about the claimant is to aid the ALJ in determining the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(e)(2). As long as the ALJ appropriately considered the nature and severity of the impairments underlying the different diagnoses, he did not need to mention each of the possible diagnoses or impressions in this lengthy record. Mrs. Fisher had been assessed or treated by many different mental health professionals, some of whom listed several different impressions within the span of a few months. The important thing is that the ALJ focused in detail on Mrs. Fisher's mental condition and reached decisions based on substantial evidence.

Mrs. Fisher also argues that the ALJ's analysis was incomplete because he failed to explain how he weighed her GAF scores. During the relevant time period, various mental health care providers assigned Mrs. Fisher GAF scores ranging from 40 to 65.[2]  R. 246, 259, 466, 569, 608, 656.  The GAF scale is not a diagnosis but is intended to be used to make treatment decisions and to measure the impact of a course of treatment. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Rev. 2000).  Neither Social Security regulations nor case law require an ALJ to use a GAF score to determine the extent of an individual's disability.  See *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002) (GAF score may assist ALJ in formulating claimant's residual functional capacity but is not essential); see also West, 3 Soc. Sec. Law & Practice § 43:143 (2007) ("A score based on the global assessment functioning (GAF) scale, while not essential, may be used to help evaluate residual functional capacity of a claimant.").  Thus, the ALJ did not err when he did not explicitly discuss Mrs. Fisher's GAF scores.

---

[2]A GAF of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  A GAF of 41-50 indicates serious symptoms or any serious impairment in social or occupational functioning.  A GAF of 51-60 indicates moderate symptoms or moderate difficulty in social or occupational functioning.  A GAF of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally the ability to function "pretty well."  *Id.*

II.     *Step Three Analysis*

Mrs. Fisher next argues that the ALJ incorrectly assessed her mental impairments under the Listings.  She asserts that she presented evidence to prove that she met the Paragraph A criteria for Listing 12.04 (Affective Disorders) and possibly met or equaled the criteria under Paragraph B.  To determine whether Mrs. Fisher met the requirements for Paragraph B, Mrs. Fisher argues, the ALJ was required to obtain an updated opinion from a medical expert.  Instead, the ALJ relied on an assessment by a state medical expert from October 8, 2003.  Mrs. Fisher argues that this assessment was incomplete because it did not reflect the evidence of Mrs. Fisher's mental illness from 2004 and 2005 that she had submitted to the Social Security Administration.

To meet or equal a disability based on Listing 12.04, Mrs. Fisher must present medical evidence to show that she satisfied the criteria under Paragraphs A and B.[3]  20 C.F.R. Pt. 404, Subpt. P, App. 1.  To meet the "A" criteria for a depressive syndrome, a type of affective disorder, Mrs. Fisher must have presented medical evidence of at least four of the following:  anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide;

_____

[3]Mrs. Fisher also could have presented evidence that she met the "C" criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  She does not appear to have presented such evidence, nor does she argue in her petition for review that the ALJ erred in his determination that she did not meet these criteria.

or hallucinations, delusions or paranoid thinking. *Id.* The ALJ did not discuss whether Mrs. Fisher had presented sufficient evidence to meet the "A" criteria, apparently assuming that she had. The court also makes that assumption.

To meet the "B" criteria, Mrs. Fisher must have proved that she had "marked" limitations in at least two functional categories. *Id.* To show a marked limitation in the category of episodes of decompensation, Mrs. Fisher must have demonstrated that she had repeated episodes of increased symptoms or signs accompanied by a loss of adaptive functioning. *Id.* The Listings define repeated episodes of decompensation as three episodes within one year, each lasting for at least two weeks. *Id.* at § 12.00(C)(4). In concluding that Mrs. Fisher did not meet the "B" criteria, the ALJ explained that she had mild restrictions of activities in daily life, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no limitation based on episodes of decompensation. R. 18. In reaching this conclusion, the ALJ assigned "substantial weight" to Dr. Evans' psychiatric review and mental residual functional capacity assessment of Mrs. Fisher, which were completed in October 2003 and reviewed by Dr. Neville in December 2003. R. 18.

The ALJ is responsible for deciding the ultimate legal question of whether a claimant's impairment meets or equals a listing. 20 C.F.R. § 404.1527(e). The ALJ reaches this decision based on all of the evidence, including medical opinions from physicians and psychologists. *Id.* at § 404.1527(c). Pursuant to Social

Security Ruling 96-6p, an ALJ must obtain an updated medical opinion from a medical expert if (a) in the opinion of the ALJ, the evidence suggests that the claimant's condition may be medically equal to one of the listed impairments; or (b) additional evidence is received that, in the opinion of the ALJ, may change the state agency physician's opinion that the impairments are not equivalent to a listed impairment.  61 Fed. Reg. 34,466 (July 2, 1996).  This standard provides for some amount of discretion by the ALJ but does not allow the ALJ to substitute his own judgment on medical issues for the judgment of a medical expert.  See *Lopez*, 336 F.3d at 540 (7th Cir. 2003) (citing several cases in which ALJ incorrectly substituted his own judgment for a physician's opinion without relying on other medical evidence or authority in the record).

In October 2003, Dr. Evans rated Mrs. Fisher as having mild restrictions of activities of daily life, mild difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.  R. 229.  To require the ALJ to request an additional medical opinion, Mrs. Fisher must have presented evidence to persuade the ALJ that between October 2003 and August 2005 her functional limitations had increased to the point that her impairment met or equaled a listed impairment, which would require her to have marked limitations in two of the four categories.

Evidence before the ALJ described a significant psychological episode on April 13, 2005. Mrs. Fisher reported to the emergency room staff at Methodist Hospital that she "went off" on everyone and had threatened to get a gun and shoot herself. R. 628. Mrs. Fisher's brother stated to hospital staff that she had threatened herself and others. R. 602. Though Mrs. Fisher has a long history of depression, she had never before had any violent or suicidal episodes. On that date, for the first time, a mental health care provider voiced suspicion that Mrs. Fisher might be suffering from schizophrenia or bipolar disorder with psychotic features. R. 608.

Though the ALJ could have requested an updated medical opinion based on this evidence, he acted within his discretion when he did not do so. The ALJ also knew that Mrs. Fisher had told the emergency room doctors on April 13, 2005 that she had no intention of committing suicide and had threatened to do so only out of anger. R. 628. The professionals who evaluated her at the time did not admit her into the hospital; they asked her to sign a no-suicide contract, R. 610, and advised her to contact her psychologist, R. 599. On July 20, 2005, just two weeks before Mrs. Fisher's hearing with the ALJ, her psychologist from Cummins Mental Health Center reported that she looked "brighter, calmer" and did not indicate concern that Mrs. Fisher's mental health was deteriorating. R. 641.

The evidence Mrs. Fisher has presented does not show that her mental health had deteriorated to the point that a medical professional would have

concluded that she had marked limitations in two of the four functional limitation categories. Even if the April 13, 2005 episode were characterized as an episode of decompensation, Mrs. Fisher has not demonstrated that she had three episodes of decompensation within one year, each lasting for at least two weeks. The ALJ acted within his discretion by not requesting an updated medical opinion as to whether Mrs. Fisher met the "B" criteria for an affective disorder.

III.    *The ALJ's Residual Functional Capacity Assessment in Step Five*

Mrs. Fisher argues that the ALJ's assessment of her residual functional capacity was flawed because he did not pay adequate attention to her breathing problems or mental illness when determining whether she was capable of working.

A.    *Breathing Problems*

Mrs. Fisher contends that the ALJ should have included a restriction from being around chemicals and cleaning agents in his finding about her residual functional capacity. The ALJ stated that Mrs. Fisher had a history of emphysema, which he considered non-severe in that it did not significantly limit her ability to perform basic work activities. R. 15. He cited evidence of many medical reports stating that Mrs. Fisher's lungs were clear. See, *e.g.*, R. 240, 254, 343, 563. The ALJ did not mention asthma as one of her impairments. Though the record is replete with references to Mrs. Fisher reporting that she suffered from asthma, there is no indication in any of the evidence she has presented that she has been

diagnosed with asthma.  None of the doctors who provided Functional Capacity Assessments for Mrs. Fisher recommended restrictions on her daily living based on emphysema or any other lung problem.  See R. 235, 521.  Each report from her periodic exams while she was incarcerated stated that there were no restrictions on Mrs. Fisher's activities.  While she was incarcerated, she was able to clean buildings, restrooms, and vehicles.  R. 690.  Thus, the ALJ relied on substantial evidence when determining that it was not necessary to include a restriction from exposure to chemicals or cleaning supplies in his assessment of Mrs. Fisher's residual functional capacity.

B.    *The Impact of Mental Illness on Ability to Work*

Mrs. Fisher argues that the ALJ erred in failing to take into account her mental illness when determining whether she was capable of working on a consistent basis.  She points to her difficulties dealing with people, following rules, and managing stress as examples of limits on her ability to function in a work setting.

Social Security Ruling 85-15 lays out the standard an ALJ must use when assessing how a claimant's mental illness might affect her ability to perform unskilled work.  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work

setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." [1983-1991] Soc. Sec. Rep. 343, *available at* http://www.ssa.gov/OP_Home/rulings/di /02/SSR85-15-di-02.html (last visited Nov. 14, 2007).

The ALJ relied on the opinions of two psychologists when he found that Mrs. Fisher was capable of performing unskilled labor with certain constraints.  In his October 2003 Functional Capacity Assessment of Mrs. Fisher, Dr. Evans concluded that Mrs. Fisher "does retain the ability to perform simple repetitive [tasks] on sustained basis."  R. 235.  In June, 2001, Dr. Shipley similarly concluded that Mrs. Fisher was "capable of simple tasks."  R. 521.  Mrs. Fisher even testified that she crocheted for several hours per day and enjoyed writing. R. 679, 683.  There is substantial evidence in the record to support the ALJ's finding that Mrs. Fisher was capable of performing simple, repetitive tasks.

Mrs. Fisher also testified that she would have difficulty getting along with a boss because of a lack of patience, R. 680, and an inability to control her feelings, R. 683.  The evidence shows that Mrs. Fisher was able to work on a consistent basis while she was in prison.  R. 689-90.  Her ex-husband testified that she had been capable of supervising her three sons approximately one night per week for over ten years.  R. 696-97.  Dr. Evans noted in 2003 that Mrs. Fisher was not significantly limited in any area of social interaction.  R. 234.  Thus, the evidence supports the ALJ's conclusion that Mrs. Fisher was not substantially

limited in her ability to maintain basic relationships with supervisors and others on a consistent basis. In his summary of Mrs. Fisher's residual functional capacity, the ALJ specifically stated that work for which Mrs. Fisher was eligible "should not require more than superficial interaction with the general public, co-workers, or supervisors." R. 18. He therefore adequately took into account Mrs. Fisher's mental illness.

*Conclusion*

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require remand. Accordingly, the decision is affirmed. Final judgment will be entered accordingly.

So ordered.

Date: November 14, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov